UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANGIE TRAMMELL,
on behalf of minor child, D.T.,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 1:13-cv-794

Dlott, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff Angie Trammell filed this Social Security appeal in order to challenge the Defendant's finding that her minor child (hereinafter "DT") is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents a single claim of error for this Court's review.  As explained below, the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I.  Background and Judicial Standard of Review**

In October 2009, Plaintiff filed an application for Supplemental Security Income (SSI) on DT's behalf, alleging a disability due to learning and behavioral problems, including mental retardation, attention deficit hyperactivity disorder ("ADHD"), auditory hallucinations, and behavioral problems in connection with her Oppositional Defiant Disorder ("ODD"), with an onset date of October 20, 2009.[1] After the application was

---

[1] SSI benefits may not be awarded for any period prior to the month in which the claimant filed an application.  *See* 20 C.F.R. §§415.330, 416.335.  Thus, the relevant disability period is the month in which Plaintiff's mother filed her application through the date of the ALJ's decision.  *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1244 (6th Cir. 1993).

denied initially and upon reconsideration, Plaintiff requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). At the time of the evidentiary hearing, DT was 14 years old and in the seventh grade, having previously been retained in the second and fifth grades. On April 2, 2012, an evidentiary hearing was held before ALJ Gregory Kenyon, at which Plaintiff appeared, represented by counsel, and gave testimony about her daughter. (Tr. 34-70). On June 28, 2012, ALJ Kenyon denied the SSI application in a written decision. (Tr. 12-33).

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). An individual under the age of eighteen will be considered to be under a disability if the child has a medically determinable impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §1382c(a)(3)(C)(i). The implementing regulations define the standard of "marked and severe functional limitations" in terms of "listing-level severity." *See* 20 C.F.R. §§416.902, 416.906, 416.924a, 416.926.

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if

2

substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income by a person under the age of 18, the Social Security Agency is guided by a three-step sequential benefits analysis. In this case, the first two steps of that analysis are uncontested. At Step 1, the Commissioner asks if the claimant is performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe." The ALJ determined that DT has the severe impairments of borderline intellectual functioning, ADHD, and ODD. (Tr. 18). Also at Step 2, the ALJ noted that DT has some physical complaints but he did not find any of those conditions to constitute a severe impairment. (Tr. 20). As would be expected for a claimant of DT's age, at Step1, the ALJ found that DT has not engaged in substantial gainful activity.

At Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments. *See* 20 C.F.R. §416.924a. The ALJ concluded that none of DT's impairments, alone or in combination, met or medically equaled a Listed Impairment that would entitle DT to a presumption of disability. Based upon the child's IQ scores as well as her diagnosis of ADHD, the ALJ specifically considered Listings 112.11 for ADHD and 112.05 for mental retardation. (Tr. 18.). The sole focus of Plaintiff's appeal to this Court is on Step 3; specifically, the ALJ's conclusion that DT does not meet or equal a Listing.

3

A claimant can medically equal a Listing, or can functionally equal a Listing. Plaintiff argues that the ALJ erred in determining that DT did not equal a Listing based upon her functional limitations. To determine functional equivalence, the Commissioner is required to assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. §416.926a(b)(1). To prove that DT has an impairment that is functionally equivalent to a Listing, Plaintiff must show that DT's impairments resulted in "marked" limitations in at least two of the six domains. 20 C.F.R. §416.926a(d).[2]

Here, the ALJ found that DT functionally experiences a "marked" limitation in only one of those domains – interacting and relating with others. The ALJ determined that DT has some limitations that are "less than marked" in attending and completing tasks, caring for herself, health and physical well-being, and acquiring and using information. (Tr. 22-27). The ALJ determined that DT has "no limitation" at all in moving about and manipulating objects. (Tr. 26). Because DT was found to have only one area of "marked" limitation, the ALJ determined that DT was not under disability, as defined in the Social Security Regulations, and was not entitled to SSI. (Tr. 28).

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. On appeal to this Court, Plaintiff argues that the ALJ erred by failing to find that DT had a "marked" limitation in the domain of acquiring and using information. Had the ALJ determined a "marked"

---

[2]Functional equivalence may also be demonstrated if a claimant's limitations are "extreme" in at least one domain, but Plaintiff makes no argument that DT's limitations fall into the "extreme" category in any domain.

4

limitation in that second area, DT would have met the functional equivalence standard for a Listing.

## II. Substantial Evidence Analysis

"Marked limitation" in a particular domain exists when the child's impairment "interferes seriously" with the ability to independently initiate, sustain, or complete activities, regardless of whether the impairment limits only one activity in the domain, or several activities. The interactive and cumulative effects of a child's impairments must be considered; both relevant regulations and several social security rulings also require the Commissioner to consider the "whole child" in making findings regarding functional equivalence. 20 C.F.R. §415.926a(b) and (c); *see also generally* SSR 09-1p. Relevant to Plaintiff's challenge in this case, a "marked" limitation is defined as a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. §416.926a(e)(2).

At the hearing, in response to the ALJ's query concerning which two of the six domains Plaintiff believed DT had "marked" or "extreme" limitations, counsel responded by referencing the failed or repeated grades which provided evidence of "marked, going into extreme, on academics." Counsel additionally listed DT's lack of "anger control" (fighting with others), "caring for herself," and incontinence/sleep issues, implying a deficit in health and physical well-being. (Tr. 69). In this appeal, Plaintiff does not dispute the ALJ's findings of "no limitation" in one domain, and "less than marked" limitations in three of other domains. Rather, Plaintiff's sole claim before this Court is that the ALJ erred in determining that DT had "less than marked" limitations in the domain of acquiring and using information. Thus, Plaintiff has waived any challenges to the ALJ's rating for any other domains.

5

The domain of acquiring and using information concerns a child's ability to acquire or learn information, and to use the information she has learned. The undersigned concludes that the ALJ's determination that DT has "less than marked" limitations in this area is supported by substantial evidence.

In reviewing the referenced domain, the ALJ discussed all relevant standards to evaluate "how well a child is able to acquire or learn information, and how well a child uses the information she has learned." (Tr. 21). As the ALJ noted, the domain involves how well children perceive, think about, remember, and use information in all settings, including their daily activities at home, at school, and in the community. (Tr. 21, citing 20 C.F.R. §416. 926a(g) and SSR 09-3p). Because DT was a "school age child" in 2009 when the application was filed on her behalf, but had progressed to the "adolescent" age category by the date of the evidentiary hearing, the ALJ appropriately reviewed what a child in each of the two age categories should be able to demonstrate in the domain of acquiring and using information. (Tr. 21-22). The ALJ also reviewed Social Security regulation 20 C.F.R. §416.926a(g)(3) and SSR 09-3p, which provide examples of the types of limited functioning in the referenced domain that a child may have over a range of ages and developmental periods. (Tr. 22).

In terms of evaluating whether a child has "marked" impairment, the regulations provide that a school age child without any impairment should be able to "learn to read, write, and do math, and discuss history and science," be able to "use these skills …to demonstrate what she has learned by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions." 20 C.F.R. §416.925a(g). She will also need to be able to use skills at home and in the community, such as "reading

6

street signs, telling time, and making change," and be able to use Increasingly complex language…to share information and ideas…by asking questions and expressing her own ideas, and by understanding and responding to the opinions of others." (Tr. 21, citing 20 C.F.R. §416.925a(g)(2)(iv) and SSR 09-3p). By the time she reaches the "adolescent" age category, a child with no impairment should be able to go to the store, use the library and public transportation, comprehend both simple and complex ideas, and apply those skills in practical ways that will help her enter the workplace after finishing school. (Tr. 22). In contrast to those with no limitations, children with limitations do not understand "words about space, size, or time (e.g., in/under, big/little, morning/night); (ii) cannot rhyme words or the sounds in words; (iii) [have] difficulty recalling important things learned in school yesterday; (iv) [do] not use language appropriate for age" or who have "difficulty comprehending written or oral directions," "[struggle] with following simple instructions," have difficulty solving mathematics questions or "[talk] only in short, simple sentences." (Tr. 22, citing 20 C.F.R. §416.925a(g)(2)(iv) and SSR 09-3p). However, the regulations "recognize that limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation." 20 C.F.R. § 416.926a

In finding that DT has some limitation in acquiring and using information but evaluating the degree of that limitation as "less than marked," the ALJ provided the following analysis:

> The claimant does have some borderline intellectual deficits. She is placed in some special classes at school and was held back in the second grade. She has a generally poor record of academic success. The claimant was nevertheless noted to be reading on grade level in 2010. Her grades appear to have varied with her level of effort and she has earned some B's and C's in Reading, A's B's and C's in Social Studies, C's in Math, B's and C's in Science, and even A's in Computers. … These grades demonstrate that the claimant is able to apply herself academically

7

> when she chooses to do so and that she does not have organically based cognitive deficits that result in a marked level of limitation in acquiring and using information. The claimant was diagnosed with moderate level mental retardation when she was examined by Dr. Whiting. … However, little weight is assigned to this …assessment in this respect in view of the subsequent academic records from the claimant's various schools which show some respectable grades when the claimant chooses to apply herself. The DDS reviewing physician of record, Dr. Ettinger, and the DDS reviewing psychologists of record, Drs. Hamlin and Levasseur both indicated that the claimant was less than markedly limited in this domain and their assessments are well supported by the record in this respect.

(Tr. 22).

At the hearing, Plaintiff's counsel made an opening statement in which she conceded that an "issue complicating this case is that Claimant and her family had to move back and forth from Florida so that made it difficult for any one agency to get to know her long enough to figure out exactly what' happening and to treat her, for an IEP to be determined and put into place." (Tr. 37). When the ALJ inquired whether Plaintiff was arguing that she meets or equals the listing for mental retardation in light of her initial application (claiming mental retardation) and the IQ test results, however, counsel was equivocal: "Well, I'm a little confused about the results of the testing…. I'm not really sure how – they were read as accurate at the time but some of the other school records and other records raise some question about it…." (Tr.38). As reflected in the above quotation from the ALJ's opinion, the ALJ determined that, despite IQ test results suggesting "moderate level retardation," Plaintiff functions at least in the borderline intellectual range.

In this appeal, "Plaintiff concedes that [the] diagnosis of moderate mental retardation is likely inaccurate," but posits that the inaccurate IQ score still should weigh in favor of a "marked" limitation in DT's ability to acquire and use information, insofar as the inaccurate IQ score may reflect DT's behavioral problems. One difficulty with this

8

argument is that Dr. Whiting's IQ exam reflected that DT "has a few friends and gets along fairly well with them and does not appear to be a major behavior problem," based upon his interview with DT and her mother. (Tr. 344). Thus, Plaintiff's argument, correlating the clearly inaccurate IQ scores with DT's behavior, is not persuasive as her behavior did not appear to be a significant obstacle at the time of the testing.

The evidence upon which the ALJ relied most heavily for his "less than marked" finding included the opinions of four consultants who determined, after review of DT's records, that she had less than marked limitations in the referenced domain. (Tr. 21). In addition, the ALJ referenced DT's academic records, which included inconsistent grades, but also a teacher assessment from DT's fifth grade teacher, Ms. Compton, which opined that DT had "no" limitations in acquiring and using information. In fact, no medical source, teacher, or other professional has ever opined that DT has "marked" limitations in the domain of acquiring and using information consistent with a disability finding. *See Price v. Com'r of Soc. Sec.*, 342 Fed. Appx. 172, 177 (6th Cir. 2009).

The relevant regulation concerning age categories in children explains that the use of age in determining functional equivalence generally means chronological age, with limited exceptions for prematurity. *See* 20 C.F.R. §416.924b(b). Plaintiff argues that DT's academic performance is even worse than that of her peers when one considers that she is older than most 7th graders. Similarly, she asserts that even though DT's performance on the reading section of the 5th grade achievement test appears to be "on track," it still is below her peer group of the same chronological age.

To support her argument that DT had "marked" limitations, Plaintiff points to DT's low achievement scores and standardized test scores from the 5th grade (Tr. 306-307, 345). The referenced scores are unquestionably low, although Plaintiff offers no specific

9

argument that they are "valid" scores that fall "at least two standard deviations below the mean" as is generally required to show "marked" limitation. 20 C.F.R. §416.926a(e)(2)(explaining that test scores at least two standard deviations below the mean must be consistent with "day-to-day functioning in domain-related activities."). In any event, the evaluation of whether substantial evidence exists does not involve deciding whether this Court would have reached a different decision based upon a focus on any specific piece of evidence. Rather, this Court's review is limited to a determination of whether "substantial" evidence exists in the record as a whole, defined as consisting of "more than a scintilla of evidence but less than a preponderance." *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Here, the professional opinions of four expert consultants and other evidence (including but not limited to Ms. Compton's opinion) amount to "substantial" evidence to support the ALJ's analysis and conclusions. It bears repeating that:

> The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d at 1035. That the evidence could be interpreted to support *either* a "marked" or a "less than marked" finding does not mean that it must be interpreted in Plaintiff's favor. When viewed in the context of the record as a whole, it is clear that substantial evidence exists to support the ALJ's determination. The Commissioner's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it. *Cutlip,* 25 F.3d at 286.

Plaintiff argues that the ALJ failed to rely on DT's mother's testimony that DT repeated two grades, including the fifth grade.[3] (Tr. 39). However, DT's mother was not entirely certain which grades were repeated, and the ALJ found the mother's testimony "not fully credible" as a whole. (Tr. 21). The ALJ acknowledged that DT had repeated the second grade, (Tr. 22), and referenced the mother's testimony that DT had repeated two grades. (Tr. 20). While the record reflects that DT earned mostly D's and F's in sixth grade, it also appears she switched schools during that year. (Tr. 300, 310). In fact, Plaintiff's grade school records include a record of frequent absences and tardiness not attributable to suspensions or expulsions from the classroom. Additionally, as Plaintiff's counsel conceded at the hearing, she moved between Florida and Ohio school systems. In other words, many issues unrelated to "marked" limitations in the domain of acquiring and using information may have impacted DT's learning, grades, and test scores.

Plaintiff also argues that the ALJ should have rejected or at least heavily discounted Ms. Compton's November 3, 2009 assessment, such that it should not be considered in support of the non-disability finding. Ms. Compton stated that she had observed DT interacting in her classroom with 20 other children for more than 6 hours per day on a daily basis since August 9, a period of nearly three months. In the assessment, Ms. Compton stated that DT's reading level was "below" grade level, but that her math level was at grade level, and that her written language was either between two levels, or had increased from below to "on level" for her grade.[4] (Tr. 207). Ms.

---

[3] Plaintiff claims that DT repeated the fourth grade, but cites testimony that refers to the fifth grade. DT's age in seventh grade (14) offers little additional evidence, insofar as her age was consistent with repeating either one or two academic grades. DT was born prematurely.
[4] The notation on Ms. Compton's assessment is consistent with either interpretation.

11

Compton opined that DT had "NO problems observed in this domain [of acquiring and using information," or in any other domain. (Tr. 208-212).  She added that she had not observed "any aspects of a physical or mental condition in the classroom."  (Tr. 213).  In written comments, she noted some behavioral issues, to the extent that DT

> has always needed reminders to follow classroom rules, complete homework, and stay focused on the task at hand.  If anything is hindering [DT's] functioning, it would lack of effort, lack of parental support in her education.  She is a pleasant girl, has friends in class, but will always look to avoid doing work whenever she can.

(Tr. 214).

Plaintiff argues that the ALJ should have rejected Ms. Compton's opinion that DT had no problems in the domain of acquiring and using information, because Ms. Compton observed DT in a busy classroom, and was unaware of DT's diagnosis of oppositional defiant disorder.  In addition, two days after Ms. Compton's report, on November 5, 2009, DT's mother requested a school conference to address DT's poor performance on her first quarter report card, where she was noted to be "below grade level" in reading and math, and "needs improvement" in multiple behavioral areas.  (Tr. 197).

In contrast to Plaintiff's argument, the undersigned does not agree a teacher's observation of a child for more than six hours per day over nearly three months was insufficient "to get to know D.T. before she completed the questionnaire."  (Doc. 10 at 13).  Moreover, holding a conference regarding DT's poor performance does not mean that DT had "marked" as opposed to "less than marked" limitation in the referenced domain.  Many children with "less than marked" limitations may perform poorly in school and/or require services.  Here, the ALJ did not entirely credit Ms. Compton's report – if he had, he would have found "no" limitations in acquiring and using information rather

12

than "less than marked" limitations, and he wouldn't have found the mental and physical impairments that he did. Again, the ALJ considered the record as a whole, not merely Ms. Compton's assessment.

Plaintiff further contends that the ALJ focused on DT's academic grades, which were admittedly "inconsistent," without sufficiently considering the impact that DT's Oppositional Defiant Disorder has upon her ability to acquire and use information. "By focusing purely on [DT]'s cognitive abilities, and on trying to determine whether [her] IQ was within the range of mental retardation, the ALJ failed to consider the "whole child" as required." (Doc. 10 at 11). Plaintiff contends that fighting and behaviors that eventually caused DT to be suspended or disciplined meant that she was not able to be present in the classroom as often as her peers, thereby contributing to her difficulty in acquiring and understanding information.

Contrary to Plaintiff's argument, the ALJ did explicitly consider the school records entered into the record following the date of the consulting psychologists' opinions. He attributed greater limitations associated with DT's mostly undertreated ODD (which led to increased fighting and suspensions over time) in the context of the domain of interacting and relating with others, in which he found DT had "marked" impairments. (Tr. 25, citing Exhibits 1F, 8F, 13F, 14F, 15F). However, the fact that he attributed greater limitations in that domain does not mean that the ALJ failed to consider the same records in other domains. In fact, the ALJ specifically referenced later teacher questionnaires (Exhibits 6E and 16F), giving them "some weight" but finding that neither report was consistent with a "functional" equivalent of "marked" impairments in two or more domains. (Tr. 21). While DT's most recent teacher, Ms. Seimer, did note behavior issues and problems that interfered with DT's academic work, the ALJ

13

reasoned that her evaluation also indicated that DT's "problems are of mixed severity." Thus, the ALJ reasonably determined that Ms. Seimer's report was consistent with his finding of "marked" limitation in the domain of interacting with others, but "less than marked" finding in acquiring and using information. (Tr. 21).

Taking a close look at the seventh grade teacher's evaluation, the undersigned concurs with that analysis. Plaintiff focuses on the fact that in Ms. Seimer's April 18, 2012 questionnaire, she rated DT's cognitive ability to apply problem solving skills in learning areas as falling between "noticeably interferes" and "very serious detriment" with "academic or social success." (Tr. 447, emphasis added). Because the referenced rating may pertain to DT's level of either academic or social success, it is not inconsistent with the ALJ's conclusion that DT has "marked" impairment in the domain of interacting with others, but "less than marked" impairment in acquiring and using information. Adding to the inference that Ms. Seimer's assessment related primarily to the domain of interacting and relating with others ("social success") and not to the domain of acquiring and using information, she did not note any limitations in DT's cognitive functioning for the listed areas of: (1) learning new material; (2) recalling and applying previously learned material; (3) reading and/or comprehending written material; (4) comprehending and following oral instructions; (5) expressing ideas in written form; or (6) requiring special help to learn successfully. (Tr. 447). It is also worth noting that the questionnaire was completed after observations of only a month, since DT had transferred to the school on March 12, and Ms. Seimer further noted her concern with DT's absenteeism and tardiness. (*Id.*, stating DT "arrives at school typically at 10:45").

Other areas of Ms. Seimer's assessment similarly are consistent with the ALJ's overall finding of "less than marked" limitation in the domain of acquiring and using

14

information. For example, in the area of "communicative skills," Ms. Seimer noted no limitations other than a fleeting reference to an apparent hearing impairment, although DT had not (yet) been referred for assessment or services. Notwithstanding that presumed impairment, Ms. Siemer indicated that she was able to understand "almost all" of DT's communications. (Tr. 448). Ms. Seimer rated DT as having the most serious impairment in the area of "personal functioning" relating to "disregard for safety rules." She explained that single extreme rating with the comment that DT's functioning "is based on negative choices – one-on-one she can be o.k., group setting = problematic." (Tr. 449). She repeated the same comment under her assessment of DT's "Social Functioning," in which she noted three areas of deficiency. For example, she noted that DT talks out of turn and defies authority, though she did not assess DT at the most impaired rating but instead at the levels of "3" and "4" on the 5-point scale for those activities. She assessed DT's impairment in following class rules as even less noticeable, at a "2." (Tr. 450). In the nine other listed activities of "Social Functioning" on the assessment form, Ms. Seimer noted no impairment. (*Id.*).

The Sixth Circuit repeatedly has held that an ALJ is not required to explicitly discuss "every single piece of evidence submitted by a party." *Kornecky v. Com'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 206)(quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 326, 453 (6th Cir. 1999))(citations and internal quotation marks omitted). The ALJ's explicit discussion of the domain of acquiring and using information might have benefitted from greater analysis of the discrete pieces of evidence on which Plaintiff relies. However, given the more obvious issue presented by DT's initial claim of mental retardation and inaccurate IQ scores, it was understandable that the ALJ focused part of his discussion on that issue in the context of the "acquiring

15

and using information" domain. Even if the ALJ did not specifically discuss each and every snippet of evidence that might have supported a greater limitation, the ALJ provided sufficient discussion for this Court to review, understand, and affirm his decision as supported by substantial evidence. Thus, Plaintiff demonstrates no reversible error.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED.**

                                       */s Stephanie K. Bowman*
                                       Stephanie K. Bowman
                                       United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ANGIE TRAMMELL,
on behalf of minor child, D.T.,   Case No. 1:13-cv-794

      Plaintiff,   Dlott, J.
                                               Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).